I'd like to reserve five minutes for rebuttal, if I could, Your Honor. May it please the Court, Jay Barnes on behalf of the plaintiffs, Your Honors. I'd like to start this morning with paragraph 188 of the plaintiff's complaint. And imagine that this morning I had picked up a telephone and called the Cleveland Clinic. I said, yes, is this the Cleveland Clinic? Great. I would like information about intestine transplants. Okay, you can read that to me now? Okay, thanks. And then they read what information they had about intestine transplants and I hung up. Or that I had called, and this is in paragraph 161, my own provider, Shawnee Mission Hospital, and said I'd like information about your center for pain medicine. Okay, that's great. And your orthopedic spine center? Yes. And specifically, Scott E. Ashcraft, M.D. Okay, thank you for that information. And unbeknownst to me, Facebook had placed a bug on the telephone and listened in to the conversation. Well, it's the unbeknownst that's your problem because of the agreement. I mean, that's really the issue, whether this was consented to. Isn't that kind of the crux of the problem for you? That is the crux of the problem. And I'd say if you think of this like an onion, there's four layers to the onion. And the first layer is totality of circumstances. The second layer is other countervailing privacy promises of Facebook's partners of which Facebook is aware. The third layer, now we're getting closer and closer here, is what were Facebook's other promises. And Facebook's most prominent privacy promise says your privacy is very important to us. So that's like saying our food is good for you, but you don't have to pay any attention to what's in it. You have an allergy, you need to tell us. It's just like pablum to say your privacy is important to us. Thank you for calling. I mean, that's not a very specific promise of anything. But, Your Honor, it's more than that because Facebook then says we will make all important disclosures that you need so that you can make informed decisions. Well, that's where I say the crux of the problem is what people agree to. And so if you go and look at Facebook's actual promise, okay, the disclosure upon which they rely, first, you have to put it in context of when and where it is. Okay, it is on sign-up at Facebook compared to the circumstances of this conduct, which is far away from Facebook. It says we collect information when you visit or use third-party websites and apps that use our services. But it does not specify the who, what, when, where, why, or how of this case. And the law of this circuit, Your Honor, is that the totality of circumstances matters in every single case when it comes to consent. The most recent case, now Facebook cited the district court case from this, but in FOBR versus management and technology consultants, this court explained that in every case, the scope of consent must be determined upon the facts of the situation in which the person gave consent. And then if you look at Theofel and the Blood Saw case, those cases stand for the proposition that in some circumstances, the totality of circumstances are such that even overt and express consent is not enough. And what we submit is that this is one of those cases, but even if it was not, Facebook's disclosure, which is buried, does not get to the specifics of the conduct alleged here. Was there an, I may be misremembering this, but I thought there was an opt-out that you could choose saying that you don't want this to happen. No, Your Honor, there is no opt-out that is not present in the complaint. We are here on a motion to dismiss. Facebook asserts that there is an opt-out from targeted advertising. But there is no opt-out from the tracking on medical websites. So, for example, the case from which they take their test, which we think is one of the elements of this, is Perkins versus LinkedIn. We think it's an incomplete test, but Perkins says it was only in light of the exact disclosures, the proximity of the disclosures to the wrongful conduct, and the fact that there was an opt-out provision. And if you read Perkins, the disclosures and the plaintiff's choice in that case occurred exactly when the conduct was happening. And the plaintiff had not just one opportunity to opt-out, but they had two opportunities to opt-out. And I wouldn't even express it that way, because the plaintiff in that case had to opt-in. But in this case, none of those things are present. The activity occurs far away from the defendant's website. The activity occurs far away in time from the defendant's website. And there's no opt-out right. Counsel, does it matter that the information involved is not protected health care information of a personal kind, like your own social security number and your weight and your blood pressure? It's more generic than that. Does that make any difference? Well, I think the district court erred in making that determination. Well, I'm asking you, that's a yes or no question. Does it matter? And whatever your answer, explain it. Okay. I think we prevail either way. We assert that HIPAA applies because the information is received or created by a hospital, it relates to these individual plaintiffs' health, and they're individually identifiable. But put HIPAA to the side, because the test for consent under this circuit, if you look at the cases that we've cited that are binding circuit precedents, is this. Would a reasonable consumer have understood and, in fact, affirmatively consented to the precise conduct here? And what is the conduct? Facebook is violating the promises in the very first paragraph of its privacy policy. It's violating the promises of entities that are health care organizations that it calls its own partners. That's really your beef. It's with the medical providers that ought not be putting this stuff out on Facebook where it can be shared. And so, obviously, they've been dismissed for lack of personal jurisdiction. They can be sued elsewhere, presumably. But it strikes me that this is, if there's a problem, it isn't with Facebook. It's with the health care providers. Well, we would agree on your assessment of the health care provider problem. But Facebook cannot, in its first paragraph, the very first one, say, your privacy is important. We'll make important disclosures so you can make informed decisions. Well, like, your happiness is very important to me, but I'm going to ask you hard questions. And so, is that a promise? Hold on. At the very same time that Facebook is actively participating in known express privacy promises to the plaintiffs about a sensitive subject. It is like an agreement to, you could have a consent that someone pushes you, correct, and say, oh, I'm going to push you, but I'm not going to hurt you. But then my partner stands behind you, and I push you, and I know my partner is behind you having assured your safety, and you fall down. Facebook cannot promise privacy on one hand and then conspire with its partners on the other hand to violate it. It doesn't say everything you put here will be kept private. It just says, generically, this concept is important. It says Facebook sets a standard for itself, that it is going to make important disclosures so you can make informed decisions. And those things that are important disclosures and informed so that you can make informed decisions, those are questions of fact to be determined upon by a jury and a fact finder based on a reasonable reading of the contract. The plaintiffs believe that that paragraph means that Facebook is going to tell them those things that a reasonable consumer would find important. And we think it's important to know that Facebook could be tracking their communications with health care providers who expressly promise to keep them private. That also goes to the good faith and fair dealing issue that the district court did not address at all. And we have a claim that this conduct is entirely inconsistent with the first paragraph of that issue, of that privacy policy, Your Honor. And let me go back to my original example, if I could. Because the ECPA, the Internet and Facebook did not erase 100 years, more than that, of common law on consent. And the fact is that the Electronic Communications Privacy Act was passed and designed specifically to give electronic communications that occur by computer the same protections that were already afforded to oral and wire communications that happened by telephone. And so if you take yourself back in time and ask if in 1985 some media company, the New York Times, to which you subscribed, had had something hidden in the contract within the New York Times that said, by the way, we're going to track every phone call you have, including phone calls you make with medical providers, would that be sufficient consent to say that the plaintiffs had consented to this third party tracking their communications with their health care providers? We think not, Your Honors. And I reserve the remainder. Thank you, Counsel. Good morning, Your Honors. May it please the Court, I'm Lauren Goldman for Appellee Facebook in this case. Plaintiff places a lot of emphasis on that your privacy is important to us. And user's policy, privacy certainly is important to Facebook. And I wanted to point the Court to where plaintiff is reading from, because plaintiff repeatedly takes that language from Facebook's Statement of Rights and Responsibilities out of conduct. E.R. 298. Exactly. Your Honor, you are two steps ahead of me. So it says, your privacy is very important to us. We designed our data policy to make important disclosures about how you can use Facebook to share with others and how we collect and can use your content and information. We encourage you to read the data policy and to use it to help you make informed decisions. So Facebook is not saying in a vacuum, your privacy is important to us and we will keep everything private. What it is saying is that your privacy is important to us and we want you to make an informed decision. So please go read our data policy. The Statement of Rights and Responsibilities goes on to say that by using Facebook, you agree that your data can be collected and used in accordance with that data policy. It says, go read the data policy. And that's where we're going to tell you what we're going to do with your data. So then, as Judge D'Avola found below, if you then go to the data policy, it covers the precise conduct that's at issue here. And so the question before this Court is whether somebody, a reasonable person reading the data policy, would understand that the kinds of search terms and the kinds of communications that the plaintiffs are alleging in their complaint would have been received by Facebook. So what Facebook says in the data policy is, we collect information when you visit or use third-party websites and apps that use our services. This includes information about the websites and apps you visit and information the developer and publisher of the app or website provides to you or us. Then, and this responds to plaintiff's point about this happening far away from Facebook, Facebook says, Facebook receives information about you and your activities on and off Facebook from third-party partners. It says, we use this information to improve our advertising and measurement systems so we can show you relevant ads on and off our services. And then finally it says, well not finally, there are many more disclosures, but most relevantly and finally, it says, we want our advertising to be as relevant and interesting as the other information you find on our services. With this in mind, we use all of the information we have about you to show you relevant ads. Okay, so it says we use all of this information. It then directs people to the cookie policy. It says we use cookies and similar technologies to provide and support our services. Read our cookie policy to learn more. Now, the plaintiffs are alleging in their complaint, as Judge Shavala noted, that the data policy, the cookie policy, and the statement of rights and responsibilities are a valid contract. So now we go to the cookie policy, and it says we may also work with an advertiser or its marketing partners to show you an ad on or off Facebook services or show you an ad based on the websites you visit or the apps you use all across the Internet and the mobile ecosystem. So Facebook is describing exactly what the plaintiffs are claiming it did in this case. It's saying when you go to websites that are on or off Facebook, we're going to collect information about your activities. We're going to look at the websites that you visit all across the Internet and the mobile ecosystem and use all of the information that we have about you to show you relevant advertising. That's precisely what the plaintiffs are claiming happened here. If this were true HIPAA information, would your answer be different in terms of the scope of consent? It wouldn't be different in terms of the scope of consent because for several reasons. So, in other words, your generic consent is you can get information on a website. Somebody gets on MyChart with their hospital, and that information is conveyed to Facebook in violation of HIPAA. Do you think there's a liability or privacy problem with that? There might be a privacy problem with that. I do not think Facebook could be liable, and let me explain why. I also would like to respond to the idea that this is HIPAA information, which it plainly is not. No, my question was hypothetical. Understood. This is hypothetical. So there's a couple reasons why HIPAA still would not apply in that situation. The first is that HIPAA does not have a private right of action. HIPAA is a government statute that regulates health care providers and health plans. And so that raises two respective problems for plaintiffs' HIPAA gloss on this case. The first is that no court has ever applied HIPAA. Plaintiffs have certainly not cited any such case to import the consent standard into another kind of case. So this is an ordinary contract consent case. And the plaintiffs are saying, but no, you should put this gloss on it because of HIPAA. But HIPAA doesn't have a private right of action. And so the U.S. Supreme Court said in the Astra case that we cited in our briefs that where a statute doesn't have a private right of action, you can't just bring a case on another theory. In that case, it was a contract theory and import the standard from the statute to create the potential for liability where there otherwise would be none because then you're vitiating the absence of a private right of action. Yes. Except that, moving to this case. Yes, Your Honor. Hypothetically, if it's HIPAA information, it would control the reasonable expectations of privacy given in the disclosures on Facebook, wouldn't it? No, Your Honor. I don't. Do you think that, so let me ask one further question. Did you think that the consent would actually afford Facebook the right to obtain HIPAA information from a provider? No, Your Honor. But that is why Facebook tells HIPAA providers, don't give us HIPAA-protected information. That's not in the record, but I just want to be clear that Facebook tells companies, like the health care defendants in this case, don't give us that personal information. And it's important to think about, if the plaintiffs are going to talk about the totality of circumstances here, it's important also to look at the health care company's disclosures. They say two things, right? First, they say, we will share information about your browsing habits. They say that is not personal. They say if you are typing terms into a search engine, that's not personal, it's not protected by HIPAA, and we may share it with third-party companies. And you should go look at those third-party companies' privacy policies to see what protections they offer. So Facebook is not bound by the health care company's promises, but those health care company promises did incorporate Facebook standards. Second of all, the health care company said, we will not share your PII. But as the Court has, I think, recognized, this is not PII. And it's worth sort of looking at that the URLs in this case are reproduced in the record at page ER, I believe, 196. And those URLs show exactly why this is not protected health information under HIPAA. And I think that my opponent's argument made that pretty clear. If you look at the language of those URLs, all they indicate is that somebody was interested in information about ‑‑ their friend or their high school newspaper article. But if the Chief is satisfied with your answer, I have a question on another ‑‑ Oh, I'm sorry, but can I just give very briefly the other reason why this is not relevant under HIPAA? It's both ‑‑ it's Your Honor's point, that their beef is with the health care companies. Because Facebook was a passive recipient of this information, if it was disclosed in violation of HIPAA, the beef is not with Facebook. The beef would be with the health care companies. But, Your Honor, go on. I'm sorry. I'm not a Facebook user, so this may be an ignorant question. But reading the data policy, there's a section called, How can I manage or delete information about me? And there's pointing to something called an activity log tool and an information tool. Is that a method for protecting this information, that is, if you don't want it shared or collected? What is that? That is a ‑‑ Is that an opt‑out? That is not an opt‑out from all data collection, but Facebook offers many ways of going in and restricting the ability of ‑‑ But it's not in the data policy itself, or is it? That's what I'm, I guess, asking out of ignorance. The activity log tool is in the data policy. That's at HDR 308. Right. That's what I was trying to ask. Not very successfully, I guess. I don't know enough to ask it well. But is that provision in the data policy itself a method of opting out of what the plaintiffs are complaining about? It is a method for restricting the information that exists after you, after you've already been to the website, as detailed in the complaint in our briefs. In this case, under the data policy, the way it worked was that Facebook received the refer header either simultaneously or shortly after plaintiffs went to the website and typed in these terms. So the activity log is a way of looking at what you've done after and making changes to what's available. It's not, it would not, I believe, prevent Facebook from receiving that information directly from the plaintiffs' browsers in the first instance. But the Facebook's help pages, which are linked from the data policy, do present a number of other ways of controlling your data on Facebook, including opting out of receiving targeted advertising. Right. You can't opt out of getting the information transmitted to Facebook. You can in a variety of other ways. I mean, I believe that this data policy that's attached to the complaint explains that very limited information, if any, I believe no information is collected when you're logged out of Facebook. The district court had noted that there are a number of other ways of protecting your information. Right, but there's no general opt-out provision to say, no, Facebook, you cannot collect the information. There are ways to restrict the dissemination or the use of information. Correct. I mean, there are other ways off of Facebook. There are, of course, cookie blockers of the kind described in the Third Circuit's decision. There are a number of other mechanisms that somebody can use. But that's precisely why Facebook is so clear about this. I mean, the plaintiffs come in and they say that our visits to these websites is information that is private and sensitive to us. And we understand and we appreciate that. These disclosures need to talk to billions of people, each of whom believes that different kinds of things are private and sensitive. So these plaintiffs are saying, well, I asked for information about cancer, and I believe that that's sensitive. Somebody else might think that their shopping habits are sensitive or the fact that they were visiting a divorce lawyer's website is sensitive or seeking parenting advice is sensitive. And because everybody thinks different things are sensitive and Facebook has to offer disclosures that will enable billions of people to make meaningful and informed decisions about the use of their data, Facebook has to say, look, we are receiving information about your activities on and off Facebook across the Internet and the mobile ecosystem and using all of that information to serve you ads. And so that is why these terms, in other words, are not general and they're not vague. They're categorical. They're saying we're receiving this information and this is how we are using it. So that is why they are binding on the plaintiffs here. This is a somewhat unusual case because the plaintiffs attached all of these agreements to their complaint and specifically alleged that they formed a valid contract. And the district court noted why they did that. They did that because they had a breach of good faith and fair dealing claim and because they had a fraud claim. And they said in their complaint that they read these policies and relied on them. They didn't allege that in a way that would satisfy Rule 9b or 12b6 or anything else for the reasons that we said in our brief, but they did allege it. And the district court pointed out, look, you can't, on the one hand, say we read and relied on these policies and then say, on the other hand, that they're buried. I mean, my opponent stood up and said, well, these policies are buried. That's not a valid argument here because they don't say that they didn't read the policies or that they were unable to find or understand the policies. To the contrary, they said they did find the policies, they read them, and they relied on them. And so that was critical to the district court's decision in this case. So we believe that the district court was correct on its consent ruling. We also believe that there are a number of other alternative reasons why each of the plaintiffs' claims fail, which are outlined in our brief. And if the Court has no further questions, I'm happy to cede the rest of my time. Thank you, Counsel. Thank you. Thank you, Your Honors. A couple quick points. MD Anderson, for example, says, under no circumstances were ever disclosed to a third party personal information about individual medical conditions or interests, except when we believe in good faith that the law requires it. When opposing counsel says the hospital said they'd do this, you can read the privacy policies of the hospitals yourselves. That's not true. In this context, why do the hospital's privacy policies matter for your case against Facebook? I love that question, Your Honor, because the existing state of Internet privacy law is that your ordinary consumer is, there's a legal fiction that they've read, understood, and agreed to all these privacy policies. Facebook is the most sophisticated Internet consumer in the entire world, and Facebook interacts with these entities that opposing counsel in itself calls its partners. And if the plaintiffs, ordinary consumers, are bound to know the stuff that's in these privacy policies of the websites with which they interact, we think the same rule ought to be applied to Facebook. These hospitals promise not to do it. Facebook knows they promise not to do it, and yet Facebook participates in the breach anyway, and that violates the very first promise. Your Honor, you asked some questions about other things. You asked some, I think they're fact questions. It's important to remember this is a motion to dismiss. Facebook does not have a way that you can purge the web browsing history from Facebook right now. About a month ago, they announced in Congress that they may create that tool in the future, but it doesn't exist right now. There's no way to opt out, unlike the cases they rely upon, where there was an opt out right then and there. The Delvecchio case is a good example. In Delvecchio 2, the very learned district court said, I'm not going to make a decision yet because I want more evidence about where the terms were, what the plaintiffs knew about the particular terms in question. And Delvecchio was very different. It was about pet supplies and tracking on Amazon.com. This is about health care decisions. It's about shopping for intestine transplants. When opposing counsel says this is... Well, maybe it is and maybe it isn't. I mean, if I were a journalist and I wanted to write an article about stomach transplants or heart transplants, I would visit all those websites. It isn't necessarily private in the way that you're describing. And, Your Honor, that may be true. That may be a good argument on class certification motion, but for these particular plaintiffs, they relate to their particular health conditions. And so that's an argument for a later day, not to say that these particular plaintiffs don't have a claim. Let me flip the hypothetical. Let's assume it's not HIPAA-protected information. How does that affect your argument? Well, another good question, because this Circuit's precedents, Theofal, Norman Bloodsaw, every case is a totality-of-circumstances case. That's true even in contract law where there's a dispute about a term of a contract. They cite Young v. Wideawake. I'd ask the Court to read Young v. Wideawake's recitation of California contract law where they talk about looking outside the four corners of the document. So how does it change? It doesn't change the result. It changes the test. The test is, considering the totality-of-circumstances, would a reasonable consumer have understood and, in fact, affirmatively consented to the precise conduct? And Facebook wants this Court to ignore everything except for two paragraphs. And everything outside those two paragraphs leads to the other result. And it's important to point out to the Court just how absurd the result Facebook wants is. If you read the next sentence of, and this was cited by opposing counsel, that says, We receive information about you on and off of Facebook. That, if this Court rules in Facebook's favor, it is giving it a blank check to collect anything and everything at once, regardless of any contrary privacy promises, regardless of any laws to the contrary, because in my hypothetical of the phone call, if the Cleveland Clinic took that data from the phone call and transferred it to Facebook via snail mail, and we sued because of that, Facebook would point to the exact same provision of their privacy policy and say, Your Honors, when they signed up for Facebook, they agreed Facebook could receive data on and off Facebook about them. And we would say, But Your Honors, you have to look at the totality-of-circumstances because that's the law in every other case. And the Internet and Facebook did not change the common law. And to rule in Facebook's favor, I think, does violence to the intent of the ECPA, which was to give computer communications the very same protections that those telephone communications had and that I talked about earlier today. Thank you, counsel. Thank you both for your arguments. The case just heard will be submitted for decision and will be in recess for the morning.
judges: Thomas, Graber, Lasnik